PEARSON, J.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA GARCAR, | ) | |
| | ) | CASE NO. 4:17CV1698 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| CITY OF YOUNGSTOWN, OHIO, *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendants. | ) | **ORDER** [Resolving ECF No. 34] |

Defendants move for summary judgment on all counts, including claims of sex discrimination, retaliation, and common-law invasion of privacy and intentional infliction of emotional distress. ECF No. 34. The Court has been advised, having reviewed the parties' briefs, the record, and applicable law. As explained below, Defendants' motion for summary judgment is granted in part and denied in part.

Additionally, because discovery has long concluded and Plaintiff has not amended her pleading to identify the unnamed "John Doe" Defendants, those Defendants are dismissed.

## I. Preliminary Notes

Although Plaintiff lists only six causes of action in her Amended Complaint, her pleading marshals myriad legal allegations based on numerous alleged occurrences. In this Order, Plaintiff's claims are addressed according to the chronological order of events that gave rise to those claims.

The Court observes that Chapter 4112 of the Ohio Revised Code tracks Title VII of the federal Civil Rights Act of 1964 both with respect to substantive law and evidentiary standards. *See Little Forest Med. Ctr. of Akron v. Ohio Civ. Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Whenever both state and federal discrimination or retaliation claims are alleged, the Court treats them as a singular allegation and applies federal case law. To the extent there is reason to treat the claims differently, the reason for that distinction is explained.

"[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011)); *see also Colston v. Cleveland Pub. Library*, 2012 WL 3309663, at *2 n.2 (N.D. Ohio Aug. 13, 2012) (deeming a claim abandoned and granting summary judgment when a plaintiff "did not respond or even mention [the] claim in her oppositions to Defendants' motions for summary judgment"). Accordingly, for claims on which Defendants move for summary judgment but Plaintiff has failed to respond in opposition, the Court deems those claims abandoned and grants summary judgment in favor of Defendants.

Finally, each instance in which Plaintiff alleges a claim of discrimination or retaliation against individual Defendants Rodney Foley and Robin Lees, those allegations arise under state law, not federal law. *See* Ohio Rev. Code § 4112.02(I),(J) (aiding and abetting discrimination and discriminatory practices).

## II. Factual and Procedural Background

### A. Disputed and Undisputed Facts

Plaintiff Sergeant Patricia Garcar has been employed at the Youngstown Police Department since 1994.  ECF No. 40 at PageID#: 880.  She obtained the rank of Sergeant in 2000.  *Id.*  From 1999 to 2004, and again from 2006 to 2014, Plaintiff was assigned to the Accident Investigation Unit.  *Id.*

### 1. 2011-2014: Assorted Discipline and Alleged Hostile Work Environment

In 2011, the Accident Investigation Unit came under the leadership of Lieutenant William Ross.  *Id.* at PageID#: 881.  Lt. Ross was Plaintiff's immediate supervisor, and Plaintiff was the second ranking officer in the Accident Investigation Unit.  *Id.*; *see* ECF No. 48 at PageID#: 1145-46.

Plaintiff asserts that Defendants' discriminatory and retaliatory conduct began in 2011, when Lt. Ross entered the picture.  She attests that she had no issues with her supervisors in the Accident Investigation Unit prior to Lt. Ross's involvement.  ECF No. 39 at PageID#: 552. According to Plaintiff,

> At first the hostility was subtle and pertained to his requirement that I be in uniform rather than plain clothes    which I had worn in the [Accident Investigation Unit] since I have been in the Unit.  Lt. Ross also replaced my unmarked vehicle with a marked cruiser, which created a difficulty because I would transport equipment that I used in accident investigation and the marked cruiser was a much smaller vehicle, which made it more burdensome to do my job.  At accident scenes my vehicle was never used for traffic control    so there was no practical reason for me to have the smaller vehicle.  Lt. Ross also began to change my assignments, such as replacing me with male officers in the training of officers to complete accident reports, which I had done as an accident reconstructionist since I was transferred to [the] Unit.

ECF No. 45 at PageID#: 966.

As time went on, Plaintiff attests, Lt. Ross's hostility began to manifest as discipline.  In 2011, Lt. Ross recorded that Plaintiff arrived several minutes late to work.  *Id.* at PageID#: 967. He gave Plaintiff a verbal reprimand, documented that discipline, and deducted fifteen minutes from her paid time.  *Id.*  Plaintiff attests that she was never notified that the reprimand had been documented as written discipline, and she therefore had no opportunity to defend herself.  *Id.* She states that leaders in the Department, on at least one other occasion, documented discipline against her without informing her of that documentation.  ECF No. 39 at PageID#: 566-67.  It is unclear whether, as a matter of Youngstown Police Department policy, an officer must be advised of all documented discipline against her.  *See id.* at PageID#: 566.

In 2012, the Vice President of the United States visited Youngstown, and Plaintiff was assigned to patrol an underpass while his motorcade passed through.  ECF No. 45 at PageID#: 967.  Lt. Ross issued discipline, purportedly because Plaintiff was posted in the wrong location during the motorcade pass-through.  *Id.*; *see* ECF No. 49 at PageID#: 1293-96.  Plaintiff disputed that she was in the wrong location, and the matter was resolved because it was determined to be unfounded.  ECF No. 45 at PageID#: 967; ECF No. 49 at PageID#: 1294-95.  Plaintiff alleges that the unfounded discipline was meant only to harass her because of her sex.  ECF No. 44 at PageID#: 906.

In early 2014, Lt. Ross alleged that Plaintiff had committed two "Accumulated Time" rule violations.  ECF No. 45 at PageID#: 967-68; ECF No. 52-4 at PageID#: 1784.  Lt. Ross alleged that Plaintiff had submitted time sheets for periods in which she had not in fact reported

to work.  ECF No. 52-4 at PageID#: 1784.  Plaintiff was issued a suspension.  ECF No. 51 at PageID#: 1584.

In investigating Lt. Ross's allegation, Chief Robin Lees ordered Plaintiff to take a polygraph test to confirm that she was, in fact, present at work for the time periods in which Lt. Ross alleged she was absent.  ECF No. 51 at PageID#: 1584-85.  Chief Lees told Plaintiff she would be fired if she did not pass the polygraph test.  *Id.*  The planned polygraph test was cancelled, however, when Internal Affairs Lieutenant Brian Butler, through investigation, discovered that Plaintiff was present during the relevant time periods.  ECF No. 50 at PageID#: 1451-52.  As with the motorcade-related discipline, Lt. Ross's allegation was determined to be unfounded.  ECF No. 52-4 at PageID#: 1783; ECF No. 45 at PageID#: 967-68.

Nevertheless, during that investigation, Plaintiff revealed that she had recently undergone a medical procedure and had been taking certain prescription medications.  *Id.* at PageID#: 1450-51.  Because Plaintiff had apparently not reported those medications to Lt. Ross, that revelation sparked an investigation of its own.  *See id.* at PageID#: 1453.  The Internal Affairs office compiled a pre-disciplinary meeting report, which detailed Plaintiff's prior disciplinary history and the specific medications that Plaintiff had disclosed she was taking.  ECF No. 39-4 at PageID#: 854-59.

In February 2014, local news media requested public records from the Internal Affairs office concerning Plaintiff's discipline.  *See id.* at PageID#: 852-859; ECF No. 34 at PageID#: 401.  In March 2014, apparently without notifying Plaintiff or obtaining her consent, Lt. Butler responded to that public-records request by forwarding a redacted copy of Plaintiff's pre-

disciplinary meeting report.  ECF No. 39-4 at PageID#: 854-59.  In that response, the names of the particular medications were blacked out.  _Id._  Local news media published a story about Plaintiff and included a link to the redacted Internal Affairs pre-disciplinary meeting report.  _Id. at PageID#: 860-61._

Consistently from 2011 to 2014, Plaintiff complained to Chiefs of Police Foley and Lees (both named Defendants) that "Lt. Ross's conduct, hostility, and disparate treatment made it difficult for [her] to do [her] job and come to work."  ECF No. 45 at PageID#: 967.  Those complaints included informal complaints, ECF No. 39 at PageID#: 603, and several formal grievances, _id._ at PageID#: 580-81.

Plaintiff asserts that, although relevant officers were aware of her concerns, Chief Rodney Foley and his successor, Chief Robin Lees, took no meaningful actions to allay them.  _See_ ECF No. 44 at PageID#: 909-11; ECF No. 48 at PageID#: 1120-21; ECF No. 49 at PageID#: 1309-10. Lt. Ross testified that Chief Foley instructed Plaintiff and Lt. Ross to hug one another and let bygones be bygones.  ECF No. 49 at PageID#: 1325.  No remedial action was documented.  ECF No. 47 at PageID#: 1080.

Unsatisfied and feeling that she had "nowhere else to go," in April 2014, Plaintiff filed a formal charge to the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination in violation of Title VII of the Civil Rights Act.  ECF No. 39 at PageID#: 553, 581-82; ECF No. 39-3 at 772-73.  On April 16, 2015, the EEOC closed its file on the matter, writing that it was unable to conclude that the named respondents had violated the Title VII statutes.  ECF No. 39-1 at PageID#: 649-51.

### 2. July 2014: Transfer to Family Service Investigation Unit

In response to that EEOC charge, in July 2014, Chief Lees ordered Plaintiff transferred from the Accident Investigation Unit to the Family Service Investigation Unit. ECF No. 40 at PageID#: 880; ECF No. 39-3 at PageID#: 774; ECF No. 48 at PageID#: 1121 (Chief Lees: "It was to address the [EEOC] complaint. . . . When the EEOC complaint came up, I wanted to resolve it."). Plaintiff states that she did not want to be transferred out of the Accident Investigation Unit and that she expressed that sentiment to Chief Lees at the time. ECF No. 45 at PageID#: 969. She attests that the transfer had a negative impact on her career. *Id.*

In October 2014, after being transferred, Plaintiff lodged another formal charge with the EEOC. ECF No. 39-3 at PageID#: 775. In that charge, she alleged that her transfer from the Accident Investigation Unit to the Family Service Investigation Unit was retaliatory, in violation of Title VII of the Civil Rights Act. *Id.* Specifically, she claimed that her initial EEOC charge (in March 2014) was protected activity, and she was transferred to the Family Service Investigation Unit as a result of engaging in that protected activity. *Id.*; ECF No. 39-3 at PageID#: 775. On May 18, 2017, the EEOC issued a determination, concluding there was reasonable cause to believe the Youngstown Police Department had unlawfully retaliated against Plaintiff in violation of Title VII. ECF No. 39-3 at PageID#: 779-80.

### 3. February 2015: Promotion and Demotion

Plaintiff attests that, while in the Family Service Investigation Unit, she was in line to be promoted from Sergeant to Lieutenant. ECF No. 45 at PageID#: 969. On February 24, 2015, she received a letter from the Mayor's Office explaining that, "[p]ursuant to the terms of the attached MEMORANDUM OF UNDERSTANDING . . . on February 23, 2015, you were promoted to Lieutenant. Effective February 24, 2015, you were demoted to Detective/Sergeant." ECF No. 39-3 at PageID#: 784; *id.* at PageID#: 785-86 (Memorandum of Understanding).[1] Plaintiff acknowledges that at least three other officers, two males and one female, experienced the same kind of "promotion and demotion" around the same time. *See* ECF No. 39 at PageID#: 570-71, 588. Apart from those individuals that she acknowledged in her deposition, Plaintiff's promotion/demotion letter reveals at least one more male officer was also promoted and immediately demoted in February 2015. ECF No. 39-3 at PageID#: 784.

### 4. March 2015: Discipline for Insubordination

In March 2015, Plaintiff was advised that she would be suspended for five days based on misconduct and insubordination. ECF No. 45 at PageID#: 969-70; ECF No. 39 at PageID#: 550, 575-76; ECF No. 39-3 at PageID#: 781-83. First, she was alleged to have taken and used a patrol vehicle for personal use without permission. *See* ECF No. 51 at PageID#: 1616-17. Second,

---

[1] The Memorandum of Understanding, signed by the City of Youngstown and the Ranking Officers' Union in February 2014, allowed for former Chief Rodney Foley to return to the rank of Captain on the conclusion of his term as Chief, and it also provided for the abolishment of certain ranking positions within the Police Department. As a consequence of the agreement, certain ranking officers were "promoted" for one day and immediately "demoted" back to their original positions. *See* ECF No. 39-3 at PageID#: 785-86.

when a superior officer called Plaintiff at home to ask about the vehicle, she was alleged to have been insubordinate and hung up on the Lieutenant.  *Id.*  That five-day suspension was eventually reduced to an eight-hour forfeiture of Accumulated Time.  ECF No. 39-1 at PageID#: 642.

Before that reduction was issued, however, Plaintiff filed a charge with the EEOC concerning the discipline.[2]  ECF No. 39-3 at PageID#: 799.  In that charge, she alleged that the discipline was issued as a result of sex discrimination and retaliation for filing past EEOC charges.  *Id.*  On May 13, 2017, the EEOC closed its file on the matter and indicated that it was unable to conclude that the Youngstown Police Department had unlawfully discriminated or retaliated against Plaintiff.  ECF No. 39-1 at PageID#: 670.

### 5. February 2016 to Present: Anonymous Letter and Subsequent Discipline

On February 11, 2016, Plaintiff anonymously sent a two-page letter, with several attached news reports, to members of the Youngstown City Council relating to certain issues at the Youngstown Police Department.  ECF No. 40 at PageID#: 882; ECF No. 52-4 at PageID#: 1765-66.  That letter repeated some allegations that had been made in a local newspaper and made other, additional allegations ostensibly based on Plaintiff's personal observations.  *See* ECF No. 40 at PageID#: 882; ECF No. 52-4 at PageID#: 1765-66.

Defendants perceived that much of the letter's content was false and defamatory.  *See*

---

[2] Plaintiff also filed a charge against the Youngstown Ranking Police Officers' labor union, alleging that it unlawfully failed to represent her in filing a grievance in response to the discipline.  ECF No. 39-3 at PageID#: 672-73.  Because the union is not named as a defendant to this litigation, however, this charge is irrelevant to the present motion.

ECF No. 39-2 at PageID#: 701; ECF No. 52-4 at PageID#: 1767-68; ECF No. 48-1 at PageID#: 1213-16.  Chief Lees testified that it was disruptive to the operation of the Police Department. ECF No. 48-1 at PageID#: 1216.  It is unclear whether the anonymous letter was ever released to the press.  _Id._ at PageID#: 1217.

The Youngstown Law Department promptly initiated an investigation and, on June 13, 2016, concluded that Plaintiff had violated multiple provisions of the Police Department Orders Manual and the City's Technology Policy.  ECF No. 39-4 at PageID#: 871-79.  At the time that investigation concluded, however, Plaintiff was not actively working in the Police Department because she was on Injured-On-Duty status.  ECF No. 39 at PageID#: 576-77; ECF No. 45 at PageID#: 971.  According to an internal Police Department email sent on December 14, 2016, the matter, which was "likely" to result in sanctions, was to be "held in 'pending' status until [Plaintiff's] return to full or light duty."  ECF No. 39-2 at PageID#: 699.

On May 18, 2017, the EEOC issued a determination on Plaintiff's October 2014 charge (based on her transfer to the Family Service Investigation Unit) and concluded that there was reasonable cause to believe Plaintiff was unlawfully retaliated against in violation of Title VII. ECF No. 39-3 at PageID#: 779-80.  On August 14, 2017, Plaintiff filed this lawsuit.  ECF No. 1. On August 18, 2017, a physician cleared Plaintiff to return to work at the Police Department. ECF No. 40 at PageID#: 883; ECF No. 39-1 at PageID#: 616-37.  On October 10, 2017, Chief Lees advised Plaintiff that, as a result of violations related to the anonymous letter sent to City Council members, she would be suspended without pay for 15 days.  ECF No. 39-2 at PageID#: 707-12.

On April 25, 2018, Plaintiff filed an Amended Complaint, alleging retaliation related to the 15-day suspension.  ECF No. 29.

**B. Summary of Plaintiff's EEOC Charges**

**1. April 2014: EEOC Charge 532-2014-1204**

On April 29, 2014, Plaintiff filed a charge with the EEOC alleging that, based on disciplinary events in 2013 and 2014, the Youngstown Police Department had unlawfully discriminated against her on the basis of her sex.  ECF No. 39-3 at PageID#: 772-73.  She also alleged that the disciplinary actions were retaliatory, but she did not explain why that might have been the case.  *Id.*

On April 16, 2015, the EEOC notified Plaintiff that it had closed its file on that charge. ECF No. 39-1 at PageID#: 649.  It explained that it was "unable to conclude that the information obtained establishes violations of the statutes."  *Id.*  The EEOC letter also declined to certify that the Youngstown Police Department was in compliance with the statutes.  *Id.*  It advised that Plaintiff was entitled to file a civil lawsuit based on the allegations of federal-law violations, but any such lawsuit "must be filed WITHIN 90 DAYS of your receipt of this notice."  *Id.*

**2. October 2014: EEOC Charge 532-2014-2317**

In October 2014, after she had been transferred from the Accident Investigation Unit to the Family Service Investigation Unit, Plaintiff filed a charge with the EEOC alleging that the Youngstown Police Department had unlawfully retaliated against her in response to her earlier EEOC filing.  ECF No. 39-3 at PageID#: 775.

On May 18, 2017, the EEOC notified Plaintiff that it had concluded "there is reasonable cause to believe" that she had been unlawfully retaliated against when she was transferred to the Family Service Investigation Unit. *Id.* at PageID#: 779-80. On November 30, 2017, Plaintiff received a notice of her right to file a civil lawsuit based on the allegations in the charge. *See* ECF No. 40 at PageID#: 882. On December 19, 2017, Plaintiff confirmed with an EEOC representative that, upon the failure of a conciliation attempt, the November 30, 2017, right-to-sue letter was correct. ECF Nos. 16, 17.

### 3. May 2015: EEOC Charge 532-2015-1276

On May 8, 2015, after she had received a five-day suspension,[3] Plaintiff filed a charge with the EEOC alleging that the discipline was unlawfully discriminatory and retaliatory. ECF No. 39-3 at PageID#: 799. She stated that the Police Department's explanation for her suspension (insubordination) was pretextual, and that she was disproportionately punished because of her sex and because she had filed EEOC charges in the past. *Id.*

On May 13, 2017, the EEOC notified Plaintiff that it was "unable to conclude that the information obtained establishes violations of the statutes." *Id.* The EEOC letter also declined to certify that the Youngstown Police Department was in compliance with the statutes. *Id.* It advised that Plaintiff was entitled to file a civil lawsuit based on the allegations, but any such lawsuit "must be filed WITHIN 90 DAYS of your receipt of this notice." *Id.*

---

[3] The suspension was later reduced to an eight-hour forfeiture of Accumulated Time. ECF No. 39-1 at PageID#: 642.

## III.  Standard of Review

### A.  Dismissal of Unnamed "John Doe" Defendants

In general, a plaintiff may proceed in civil litigation against unidentified defendants for some period of time to permit her the opportunity to identify those defendants through reasonable discovery.  "Fictitious names," however, "must eventually be dismissed, if discovery yields no identities."  *Atlantic Used Auto Parts v. City of Philadelphia*, 957 F. Supp. 622, 625 (E.D. Pa. 1997) (quoting *Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 35 (E.D. Pa. 1990)).  Pursuant to Fed. R. Civ. P. 21, the Court may dismiss a party at any time, on its own initiative, on just terms.

### B.  Summary Judgment

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial."  *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely

on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). To defeat the motion, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

"The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). The fact under dispute must be "material," and the dispute itself must be "genuine." A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Scott*, 550 U.S. at 380. In determining whether a factual issue is "genuine," the Court assesses whether the evidence is such that a reasonable jury could find that the non-moving party is entitled to a verdict. *Id.* ("[Summary judgment] will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## IV. Law and Analysis

### A. Dismissal of Unnamed "John Doe" Defendants

Federal courts disagree about the propriety of naming "John Doe" defendants in civil

litigation, but it is generally not prohibited.  *Compare, e.g.*, *Warren v. Goord*, 476 F. Supp. 2d 407, 413-14 (S.D.N.Y. 2007) ("it is proper for a section 1983 plaintiff to use a 'Doe' pleading until such time as her identity can be learned through discovery or through the aid of the trial court"); *with* *Buckheit v. Dennis*, 713 F. Supp. 2d 910, 918 n.4 (N.D. Cal. 2010) ("'Doe' pleading is generally improper in federal court; there is no provision in federal rules permitting the use of fictitious defendants.").  When John-Doe allegations point to specific, real individuals, each of which is alleged to have committed particular acts or omissions, it is prudent to permit the allegations against the John Does "at least until reasonable discovery permits the actual defendants to assume their places."  *Atlantic Used Auto Parts v. City of Philadelphia*, 957 F. Supp. 622, 625 (E.D. Pa. 1997).

"Fictitious names," however, "must eventually be dismissed, if discovery yields no identities."  *Id.* (quoting *Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 35 (E.D. Pa. 1990)).  Pursuant to Fed. R. Civ. P. 21, the Court may dismiss a party at any time, on its own initiative, on just terms.

Discovery concluded in this case on August 27, 2018.  ECF No. 32.  Defendants filed a motion for summary judgment on September 24, 2018, and that motion became ripe for the Court's review on December 21, 2018.  At no point in any party's briefing were the John Doe defendants identified, nor were the John Doe allegations discussed.  The Court finds that it would be unjust at this stage of proceedings to permit the Doe pleadings to persist.  More than six months have elapsed since the conclusion of discovery and Plaintiff has not filed a motion to amend identifying the John Doe defendants, nor has she attempted to serve any additional

defendants with the Amended Complaint. *See* 957 F. Supp. at 625. Pursuant to Fed. R. Civ. P. 21, the Court exercises its discretion to dismiss all John Doe defendants from this litigation without prejudice.

### B. Summary Judgment

#### 1. 2011-2014: Hostile Work Environment

##### a. Federal-Law Claims

Plaintiff alleges that, between some time in 2011, when Lt. Ross became her supervisor, and April 29, 2014, when she filed her first EEOC charge, Defendants unlawfully discriminated against her on the basis of sex by creating and promoting a hostile work environment. ECF No. 29 at PageID#: 362-66.

When a plaintiff receives a notice of suit rights from the EEOC concerning possible Title VII violations, she has 90 days within which to file a civil lawsuit based on those allegations. 42 U.S.C. § 2000e-5(f)(1). Plaintiff filed an EEOC charge alleging a discriminatory and retaliatory hostile work environment for this time period on April 29, 2014, and the EEOC issued a right-to-sue letter on April 16, 2015. ECF No. 39-3 at PageID#: 772-73; ECF No. 39-1 at PageID#: 649. Plaintiff concedes that she filed this lawsuit well after 90 days had elapsed. *See* ECF No. 44 at PageID#: 918. She does not argue that the 90-day requirement should be waived or tolled or that Defendants should be estopped from invoking it. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

The only EEOC right-to-sue letter that corresponds to the hostile-environment allegations between 2011 and April 2014 was issued on April 16, 2015.[4] ECF No. 39-1 at PageID#: 649. Plaintiff's federal-law claims based on those allegations, therefore, must be dismissed.

### b. State-Law Claims

### i. Jurisdiction and Timeliness

Despite her failure to file within 90 days of receiving a right-to-sue letter, Plaintiff argues that the state-law counterpart claims, based on discriminatory hostile work environment between 2011 and mid-2014, should persist. ECF No. 44 at PageID#: 918.

Preliminarily, the Court observes that, even in the absence of corresponding federal-law claims, the Court can take supplemental subject-matter jurisdiction over these state-law allegations. *See* 28 U.S.C. § 1367(a). Plaintiff's 2011-2014 hostile-environment allegations arise from a common nucleus of operative fact as the remaining claims. *See United Mine Workers of America v. Gibbs, 383 U.S. 715, 725 (1966)*. Specifically, all claims arising between 2011 and 2017 hinge on the core factual allegations that Defendants harbored special animus toward Plaintiff because she was a woman, Defendants repeatedly acted on that animus, and Defendants further punished Plaintiff when she complained about unfair treatment. The Court, therefore, takes jurisdiction over the state-law hostile-environment claims pursuant to 28 U.S.C. § 1367(a).

---

[4] Plaintiff argues that her other EEOC charges also address the 2011-2014 hostile-environment allegations, and the allegations should survive because she filed suit within 90 days of receiving the right-to-sue letters that corresponded to those charges. ECF No. 44 at PageID#: 918. The Court rejects the premise. Plaintiff's other EEOC charges do not address these hostile-environment allegations except by allusion.

Plaintiff's state-law discrimination allegations arise under Ohio Rev. Code § 4112.02.

Allegations of sex discrimination under Chapter 4112 are subject to a six-year statute of

limitations, and they require neither timely exhaustion of administrative remedies nor a right-to-

sue letter as an entry ticket. *Cosgrove v. Williamsburg of Cincinnati Mgmt. Co.*, 638 N.E.2d 991,

994 (Ohio 1994); *see id.* at 998 (Resnick, J., concurring); Ohio Rev. Code § 2305.07 (statute of

limitations). Plaintiff filed this lawsuit on August 14, 2017. ECF No. 1. Claims arising on or

after August 15, 2011, therefore, are timely.

### ii. Merits

Defendants contend that, even if the 2011-2014 hostile-environment claims are timely,

Defendants are entitled to judgment as a matter of law because Plaintiff fails to build a *prima

facie* case of discrimination. ECF No. 34 at PageID#: 409-412.

Federal case law interpreting Title VII of the Civil Rights Act is generally applicable to

discrimination claims arising under Ohio Rev. Code chapter 4112. *Little Forest Med. Ctr. Of

Akron v. Ohio Civ. Rights. Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1992). The Court, therefore,

cites to federal-court cases in its analysis of Plaintiff's state-law claims.

"Discrimination so 'severe or pervasive' as to 'alter the conditions of the victim's

employment and create an abusive working environment' violates Title VII." *Hafford v. Seidner*,

183 F. Supp. 3d 506, 512 (6th Cir. 1999) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S.

57, 67 (1986)). A *prima facie* case of discriminatory hostile work environment requires a

plaintiff to show that (1) she was a member of a protected class, (2) she was subject to

unwelcome harassment, (3) that harassment was based on her sex, (4) the harassment

unreasonably interfered with her work performance or created a hostile or offensive work environment that was severe and pervasive, and (5) liability is attributable to the employer itself (as opposed to the coworker alone without the employer's knowledge or responsibility). *Fenton v. HiSAN, Inc.*, 174 F.3d 827,829-30 (6th Cir. 1999); *see Hafford*, 183 F. Supp. 3d at 512.

In this case, the fourth prong is the bone of contention. Defendants argue that there is no dispute of material fact that any hostility or harassment, if it occurred at all, was not "sufficiently severe or pervasive to interfere with [Plaintiff's] work . . . ." ECF No. 34 at PageID#: 412. To support this argument, Defendants point to a perceived contradiction in Plaintiff's own narrative. In her deposition, Plaintiff noted that, despite her internal complaints, grievances, and eventual EEOC charge, between 2012 and 2014, she "was still doing [her] job and still doing [her] job well." ECF No. 39 at PageID#: 560. Asked to explain, she stated that there was nothing during that time that prevented her from "completing [her] tasks," and that she "just learned to suck it up." *Id.*

Defendants suggest that Plaintiff categorically cannot satisfy the fourth element of her *prima facie* case because the alleged harassment did not interfere with her work performance. ECF No. 34 at PageID#: 412. They do not, however, address the possibility that, even if Plaintiff was not inhibited from carrying out her duties, she nevertheless endured "a hostile or offensive work environment that was severe and pervasive." *Fenton*, 174 F.3d at 830. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include . . . whether [alleged harassment] unreasonably interferes with an employee's

work performance," but the entire test is not consumed by that single inquiry.  *See Harris v. Forklift Sys., Inc.*, 114 S. Ct. 367, 371 (1993).

Defendants' observation that, between 2012 and 2014, was "doing [her] job well" is probative of whether her work environment was hostile, gauged against a reasonable-person standard, *see id.*, but it is not decisive.  Defendants may, of course, attempt to persuade a jury that Plaintiff was not subject to severe and pervasive harassment.  But they are not entitled to judgment as a matter of law on state-law allegations of discriminatory hostile work environment between 2011 and 2014.

### 2. March 2014: Disclosure of Medical Information

In her Amended Complaint, Plaintiff alleged that Defendants had unlawfully invaded her privacy when they "disclosed [her] private medication information without her authorization." ECF No. 29 at PageID#: 366.  Although Defendants raised the issue in their summary-judgment brief, Plaintiff did not address invasion of privacy in her response.  "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  *Brown v. VHS of Michigan, Inc.*, F. App'x 368, 372 (6th Cir. 2013).

Summary judgment is granted in Defendants' favor with respect to Plaintiff's claim of common-law invasion of privacy.

### 3. July 2014: Transfer to the Family Service Investigation Unit

#### a. Discrimination

In her Amended Complaint, Plaintiff alleged that her transfer from the Accident Investigation Unit to the Family Service Investigation Unit in July 2014 was unlawfully

discriminatory.  ECF No. 29 at PageID#: 362.  Because she failed to address the issue in her

response to Defendants' motion for summary judgment, the claim is deemed abandoned.  *See*

*Brown*, F. App'x at 372.

Summary judgment is granted in Defendants' favor on Plaintiff's claim that her transfer

in July 2014 was unlawfully discriminatory.

### b.  Retaliation

As with allegations of discrimination, federal case law governing unlawful retaliation is

generally applicable to claims arising under Ohio Rev. Code § 4112.02(I).  *Greer-Burger v.*

*Temesi*, 879 N.E.2d 174, 180 (Ohio 2007).  To make a *prima facie* case of unlawful retaliation

under Title VII and Ohio Rev. Code § 4112.02(I), a plaintiff must show that (1) she engaged in a

protected activity, (2) the defendant was aware that she had engaged in that activity, (3) the

defendant took an adverse employment action against the plaintiff-employee, and (4) there is a

causal connection between the protected activity and the adverse action.  *Id.* (citing *Canitia v.*

*Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)).  The United States Supreme

Court has recently clarified that the causal connection is gauged against a "but-for" standard.

*Univ. Of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013).

In this case, Plaintiff engaged in protected activity by filing her initial EEOC charge in

April 2014.  ECF No. 39-3 at PageID#: 772-73.  Then-Chief Robin Lees knew that she had filed

that EEOC charge.  ECF No. 48 at PageID#: 1120-21.  Explaining why he ordered Plaintiff

transferred from the Accident Investigation Unit to the Family Service Investigation Unit, Chief

Lees explained, "It was to address the [EEOC] complaint. . . . When the EEOC complaint came

up, I wanted to resolve it." *Id.* at PageID#: 1121. The EEOC investigator concluded, "There is no dispute that [Plaintiff] was told that she was being transferred because she had filed a charge with the EEOC." ECF No. 39-3 at PageID#: 779.

Plaintiff indisputably satisfies the first, second, and fourth prongs of the retaliation test.[5] Defendants posit that, because Plaintiff's transfer was not attended by a demotion, decreased pay, or decreased hours, it should not be deemed an "adverse employment action." ECF No. 34 at PageID#: 416.

"A mere inconvenience or an alteration of job responsibilities or a bruised ego is not enough to constitute an adverse employment action." *White v. Burlington Northern and Santa Fe Ry.*, 364 F.3d 789, 797 (6th Cir. 2004) (quotation marks and citation omitted). Rather, a plaintiff must show that she suffered "a materially adverse change in the terms of her employment." *Id.* (quotation marks and citation omitted). "A reassignment without salary or work hour changes . . . may be an adverse employment action if it constitutes a demotion evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (quotation marks and citation omitted).

Plaintiff attests that she did not want to leave the Accident Investigation Unit, and she says that she expressed that sentiment to Chief Lees when she received the transfer order. ECF No. 45 at PageID#: 969. She attests that the transfer gave her fewer opportunities to earn

---

[5] In spite of Chief Lees' candid explanation, given under oath, Defendants argue that Plaintiff's transfer was not a but-for result of her having filed an EEOC charge, and that there can be no genuine dispute of material fact as to that assessment. ECF No. 34 at PageID#: 415-16. The Court is not persuaded.

Accumulated Time and inhibited her ability to work in the private sector "while on the force and after retirement." *Id.*

Plaintiff had been working in the Accident Investigation Unit for thirteen years. ECF No. 40 at PageID#: 880. In 2006, she obtained specialty education at Northwestern University and is a "certified accident reconstructionist." ECF No. 39 at PageID#: 538. As she describes it, that education was "very intensive" and involved "a lot of math." *Id.* Accident reconstruction, she explains, is about "applying formulas." *Id.* Plaintiff continued, "And in these classes I attended, we had to learn those formulas and how to apply the correct ones and how to recognize certain physical aspects of crashes and then come up with conclusions on how they happened." *Id.* By contrast, Plaintiff testified that she had no prior experience in family service investigations. *Id.* at PageID#: 560.

The transfer from the Accident Investigation Unit to the Family Service Investigation Unit, although not necessarily accompanied by changes to her title or salary, significantly changed and arguably diminished Plaintiff's material responsibilities. Whether a given employment event was an "adverse employment action" is a question of fact for the jury to decide. *See Burlington Northern*, 364 F.3d at 797 (discussing a "factual finding" of adverse employment action); *Lentz v. City of Cleveland*, 333 F. App'x 42, 57 (6th Cir. 2009) ("[W]here the law does not clearly indicate whether the undisputed facts concerning an employer's conduct render the conduct an adverse employment action, a judge must allow the jury to decide whether an adverse employment action has occurred.").

The parties dispute a factual conclusion that will make or break Plaintiff's *prima facie* case. Because there remains a genuine dispute of material fact, summary judgment is denied as to Plaintiff's claim that her July 2014 transfer was unlawfully retaliatory.

### 4. February 2015: Promotion and Demotion

#### a. Discrimination

In her Amended Complaint, Plaintiff alleged that her promotion and immediate demotion in February 2015 was unlawfully discriminatory. ECF No. 29 at PageID#: 362. Because she failed to address the issue in her response to Defendants' motion for summary judgment, the claim is deemed abandoned. *See Brown*, F. App'x at 372.

Summary judgment is granted in Defendants' favor on Plaintiff's claim that her promotion and demotion in February 2015 was unlawfully discriminatory.

#### b. Retaliation

##### i. Federal-Law Claim

A *prima facie* retaliation case requires four showings. A plaintiff must show that (1) she engaged in a protected activity, (2) the defendant was aware that she had engaged in that activity, (3) the defendant took an adverse employment action against the plaintiff-employee, and (4) there is a but-for causal connection between the protected activity and the adverse action. *Canitia*, 903 F.2d at 1066; *see Nassar*, 570 U.S. at 348.

Plaintiff alleges that her promotion and immediate demotion in February 2015 was an unlawful retaliatory act. ECF No. 29 at PageID#: 365. As in her other claims of retaliation, she attests that she engaged in protected activity when she filed her earlier EEOC charges (one in

April 2014 and another in October 2014), and that Defendants were aware of her engagement in that protected activity. *See* ECF No. 39-3 at PageID#: 772-73, 775; ECF No. 48 at PageID#: 1120-21. She further argues that her promotion and subsequent demotion was "a materially adverse change in the terms of her employment."[6] ECF No. 44 at PageID#: 913, n.18; ECF No. 39 at PageID#: 599-600 (Plaintiff attesting that she lost income); *see Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).

Apart from conclusory assertions, Plaintiff does not show that her promotion and demotion was the but-for response to her engagement in protected activity. She acknowledges that her promotion and subsequent demotion occurred "due to a secret memorandum of understanding" between the City of Youngstown and the ranking officers' union. ECF No. 44 at PageID#: 912; *see* ECF No. 45 at PageID#: 969; ECF No. 39 at PageID#: 572; ECF No. 39-3 at 785-86 (Memorandum of Understanding). She concedes that at least three other officers, two males and one female, experienced the same kind of "promotion and demotion," also due to the Memorandum of Understanding, around the same time. ECF No. 39 at PageID#: 570-71, 588. Additionally, a higher-ranking, male officer also experienced a promotion and demotion on the same day that Plaintiff did. ECF No. 39-3 at PageID#: 784.

Plaintiff argues that the Memorandum of Understanding is unfair and invalid because it

---

[6] The Court does not take as given that Plaintiff's promotion and subsequent demotion was an "adverse employment action." As discussed below, it is unnecessary to decide the question because Plaintiff fails to meet her *prima facie* burden in a different respect: she does not demonstrate that her promotion and demotion was a but-for response to her engagement in protected activity.

was signed only by the union leader, not approved by the union members. ECF No. 44 at PageID#: 912; ECF No. 45 at PageID#: 969. She asserts that the Memorandum of Understanding was never formally made part of the collective bargaining agreement and that no one else in the Youngstown Police Department knew of the Memorandum of Understanding at the time it was executed or implemented. ECF No. 45 at PageID#: 969.

Plaintiff's contentions do not sound in civil-rights retaliation. She makes no meaningful effort to prove that her promotion and demotion, experienced by at least four other ranking officers, was caused by her engagement in protected activity. To the extent she argues that the promotion and demotion was a violation of contract law or labor-relations law, those arguments are irrelevant to the civil-rights retaliation claim before the Court.

Plaintiff fails to establish a *prima facie* case of unlawful retaliation. There is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law as to Plaintiff's federal-law claim of unlawful retaliation with respect to Plaintiff's February 2015 promotion and demotion. Summary judgment is granted for Defendants on this count.

### ii. State-Law Claim

Defendants argue that the Court cannot take subject-matter jurisdiction over the state-law portion of Plaintiff's retaliation allegation.[7]  Although the claim is "part of the same case or controversy" as its counterpart federal-law claims, *see* 28 U.S.C. § 1367(a), Defendants (in their reply brief) question whether the state-law portion of this allegation can be brought to court at all.[8]  ECF No. 55 at PageID#: 1934-37, 1937 n.2.

Under Ohio Rev. Code § 4117 and *Crawford v. Kirtland Local Sch. Dist. Bd. of Educ.*, __ N.E.3d __, 2018 WL 5921003, at *4 (Ohio Nov. 13, 2018), when parties to litigation are governed by a collective bargaining agreement, a court cannot take subject-matter jurisdiction if the relevant claims "arise from or depend on the collective bargaining rights" established in the agreement.  "Even when the rights asserted by a plaintiff are created by state law, if the application of the law is dependent on an analysis or interpretation of a collective bargaining

---

[7] A retaliation analysis on the merits is identical under both federal and state civil-rights law, *Greer-Burger*, 879 N.E.2d at 180, and the Court has already granted summary judgment on the corresponding federal-law claim.  *See above.*  Nevertheless, the Court may not entertain the merits of a claim based on "hypothetical jurisdiction" even if the result is obvious or inevitable.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998).

[8] "It is a well-established procedural rule in the Sixth Circuit that failure to raise an argument in a motion acts as a waiver of that argument."  *United States v. 2007 BMW 335i Convertible, VIN:WBAWL73547PX47374*, 648 F. Supp. 2d 944, 952 (N.D. Ohio 2009) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552-53 (6th Cir. 2008)).  As Defendants point out, however, "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."  *United States v. Cotton*, 535 U.S. 625, 630 (2002).  At the Court's invitation, Plaintiff filed a sur-reply to respond to Defendants' jurisdictional challenge.  ECF No. 57.

agreement, the trial court lacks subject matter jurisdiction over the matter." *Crawford*, 2018 WL 5921003, at *4.

To assess whether it can take subject-matter jurisdiction, then, the Court assesses Plaintiff's allegations as to each prong of her retaliation claim. Under Ohio law, a *prima facie* retaliation case requires four showings. A plaintiff must show that (1) she engaged in a protected activity, (2) the defendant was aware that she had engaged in that activity, (3) the defendant took an adverse employment action against the plaintiff-employee, and (4) there is a but-for causal connection between the protected activity and the adverse action. *Greer-Burger*, 879 N.E.2d at 180 (citing *Canitia*, 903 F.2d at 1066); *see Nassar*, 570 U.S. at 348.

Prongs one and two are easily met without analysis or interpretation of the Collective Bargaining Agreement. By February 2015, Plaintiff had filed prior EEOC charges, the filing of which amounted to engagement in a protected activity, and Defendants were aware of those charges. *See* ECF No. 39-3 at PageID#: 772-73, 775; ECF No. 48 at PageID#: 1120-21. The fourth prong of the retaliation analysis also does not require recourse to the Collective Bargaining Agreement because nothing in the Collective Bargaining Agreement governs or explains the appropriate causes for promotion and immediate demotion.

At the third stage of the retaliation analysis, the Court asks: Did Plaintiff suffer a "materially adverse change in the terms of her employment?" *Burlington Northern*, 364 F.3d at 797. Plaintiff attests that, based on the results of the Civil Service Examination, she was in line for a promotion from Sergeant to Lieutenant. ECF No. 45 at PageID#: 969; *see* ECF No. 40 at PageID#: 881. On February 23, 2015, Plaintiff was promoted to the position of Lieutenant, at an

increased hourly wage. ECF No. 39-3 at PageID#: 784. The next day, she was demoted to the position of Sergeant, and her hourly wage reverted to its original level. *Id.* Whether that series of events can fairly be described as an "adverse employment action," and whether it can fairly be attributed to Plaintiff's EEOC charge filing, depends in large part on whether Plaintiff was entitled to receive, or at least to retain, the promotion to Lieutenant in the first place.

The body of the Collective Bargaining Agreement in effect in February 2015 is silent as to rights and obligations with respect to promotions and demotions. *See* ECF No. 52-3. "Side Letter #5" is incorporated into that Collective Bargaining Agreement, but it discusses reductions in force that occurred only between June 1, 2011, and May 31, 2014. *Id.* at PageID#: 1720. The Memorandum of Understanding relating to abolishment by attrition (originally signed February 2, 2014), however, directly addresses ranking officers' entitlement to promotion and the likelihood of immediate demotion in February 2015: "During this attrition process the City agrees to fill the affected positions (those being eliminated via abolishment and the ensuing sergeant and lieutenant vacancies created temporarily . . . ) . . . pay the promoted individuals a single day of pay, and then demote the individuals back to their former position . . . ." ECF No. 52-4 at PageID#: 1760-61. If that Memorandum of Understanding was part of the Collective Bargaining Agreement in effect between 2014 and 2016, then a trier of fact would have no choice but to take it into account when determining whether Plaintiff's promotion and demotion was a "materially adverse change in the terms of her employment," *see Burlington Northern*, 364 F.3d at 797, or whether, by contrast, it was a clerical procedure meant to "preserve the reappointment rights of affected individuals . . . ." ECF No. 52-4 at PageID#: 1761. It the Memorandum of

Understanding was part of the Collective Bargaining Agreement in effect between 2014 and 2016, then this claim belongs in the grievance process, not in court.

Plaintiff disputes that the Memorandum of Understanding ever became part of the 2014-2016 Collective Bargaining Agreement at all.[9] ECF No. 44 at PageID#: 912-13; ECF No. 55 at PageID#: 1937. The Memorandum of Understanding was signed by the Union President Captain Kevin Mercer on February 28, 2014, but unlike the Collective Bargaining Agreement, it was not signed by the Union Vice President, Secretary, or Treasurer. *Compare* ECF No. 39-3 at PageID#: 785-86, *with* ECF No. 52-3 at PageID#: 1715. Plaintiff asserts, and Defendants do not contest, that Captain Mercer signed the Memorandum of Understanding in February 2014 without first convening a vote by the Union members. *Compare* ECF No. 44 at PageID#: 912, *with* ECF No. 55 at PageID#: 1934-37. The later Collective Bargaining Agreement (effective June 1, 2014), signed well after the abolishment-by-attrition Memorandum of Understanding, did not attach or expressly mention that Memorandum of Understanding, even though it incorporated other similar documents. ECF No. 52-3 (signed January 8, 2015); *see* ECF No. 48-1 at PageID#: 1191-95; ECF No. 51 at PageID#: 1599-1600. Asked why the 2014-2016 Collective Bargaining

---

[9] Defendants suggest that even this threshold question should be determined through the grievance process, outside of court. *See* ECF No. 55 at PageID#: 1937. A court, however, is not stripped of jurisdiction merely by the fact of one party's unproven contention that a collective bargaining agreement contains a certain term or incorporated document. Such a theory would channel legitimate, non-CBA disputes away from a judicial forum whenever one party could plausibly (or implausibly) suggest that a given piece of paper should be considered part of the governing collective bargaining agreement, and that the litigation implicates collective bargaining rights described on that paper. It is the Court's obligation to assess parties' evidence relating to jurisdictional facts. *Cf. Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553-54 (2014) (explaining that it is the court's obligation to ascertain whether the amount-in-controversy requirement is satisfied in the context of diversity jurisdiction).

Agreement did not attach or expressly incorporate the Memorandum of Understanding, Captain

Mercer answered, "I guess it could have. You'd have to ask the lawyers why they didn't do it."

ECF No. 51 at PageID#: 1600. Perhaps noticing their mistake, the parties *did* attach the

Memorandum of Understanding to the subsequent collective bargaining agreement, which took

effect on January 1, 2017. ECF No. 52-4 at PageID#: 1760-61. Given those circumstances, the

Court finds that the Memorandum of Understanding was not incorporated into the Collective

Bargaining Agreement in effect at the time of Plaintiff's promotion and demotion.

The Court finds that Plaintiff's claims do not "arise from or depend on" the parties'

collective bargaining rights as articulated in the Collective Bargaining Agreement in effect in

February 2015. It therefore takes subject-matter jurisdiction over Plaintiff's claim that her

promotion and immediate demotion was unlawfully retaliatory.

Having taken jurisdiction, the Court grants summary judgment to Defendants on the

merits. For the reasons described above, under the subheading "Federal-Law Claim," Defendants

are entitled to judgment as a matter of law on this state-law retaliation claim. Plaintiff's

contentions do not sound in civil-rights retaliation. Plaintiff makes no showing that her

promotion and demotion, experienced by at least four other ranking officers, was caused by her

engagement in protected activity. To the extent she argues that the promotion and demotion was

a violation of contract law or labor-relations law, those arguments are irrelevant to the civil-rights

retaliation claim before the Court.

Summary judgment is granted in favor of Defendants.

### 5. March 2015: Discipline for Insubordination

Plaintiff alleges that the discipline she received in March 2015, although ostensibly given in response to insubordination, was in fact given in unlawful retaliation for her past EEOC charges. ECF No. 29 at PageID#: 364-65.

As discussed above, under both federal and state civil-rights law, a *prima facie* retaliation case requires four showings. A plaintiff must show that (1) she engaged in a protected activity, (2) the defendant was aware that she had engaged in that activity, (3) the defendant took an adverse employment action against the plaintiff-employee, and (4) there is a but-for causal connection between the protected activity and the adverse action. *Greer-Burger*, 879 N.E.2d at 180 (citing *Canitia*, 903 F.2d at 1066); *see Nassar*, 570 U.S. at 348.

In this case, all agree that Plaintiff had filed two prior EEOC charges against the Youngstown Police Department alleging discrimination and retaliation, one in April 2014 and another in October 2014. *See* ECF Nos. 39-3 at PageID#: 772-73, 775. The parties do not dispute that those EEOC charges were protected activity, and they do not dispute that Defendants knew that Plaintiff had filed those charges. Furthermore, the parties do not dispute that Plaintiff's discipline was an adverse employment action. Rather, Defendants say there is no evidence causally linking the five-day suspension (later reduced to an eight-hour time forfeiture) to Plaintiff's earlier EEOC charges. ECF No. 34 at PageID#: 416-17. They explain that the March 2015 discipline was nonretaliatory and that it was issued in response to a documented instance of insubordination, in which Plaintiff allegedly took a patrol vehicle home without

permission and subsequently hung up on a superior officer during a heated phone call. *See* ECF No. 51 at PageID#: 1616-17.

In her Amended Complaint and her opposition to summary judgment, Plaintiff supplies no specific evidence linking her EEOC charges to the March 2015 discipline she received. In the affidavit supporting her opposition to summary judgment, she states that the discipline "was related to [her] prior EEOC Charges," ECF No. 45 at PageID#: 969-70, but she provides nothing more than conclusory assurances that her assertion is correct.[10]

Because Plaintiff fails to satisfy her *prima facie* burden to show that her March 2015 discipline was unlawfully retaliatiatory, summary judgment is granted for Defendants as to that allegation.

### 6. October 2017: Discipline After Anonymous Letter

"[T]he framework for analyzing a Title VII retaliation claim is distinct from the framework for analyzing a First Amendment retaliation claim." *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014). Plaintiff alleges both kinds of retaliation in response to the anonymous letter she sent to City Council members in February 2016.

#### a. Title VII and Chapter 4112 Retaliation

Under state and federal civil-rights retaliation law, a plaintiff must show that (1) she engaged in a protected activity, (2) the defendant was aware that she had engaged in that activity,

---

[10] In the same affidavit, she attests that her discipline was "grotesquely disproportionate as male officers have actually swore and hung up on superiors and have not faced any discipline for their conduct." ECF No. 45 at PageID#: 969. This assertion, if true, is perhaps probative of sex discrimination, but not retaliation. Plaintiff's Amended Complaint does not allege sex discrimination relating to her March 2015 discipline. *See* ECF No. 29 at PageID#: 362-64.

(3) the defendant took an adverse employment action against the plaintiff-employee, and (4)

there is a but-for causal connection between the protected activity and the adverse action.

*Greer-Burger*, 879 N.E.2d at 180 (citing *Canitia*, 903 F.2d at 1066); *see Nassar*, 570 U.S. at 348.

      Plaintiff's February 2016 anonymous letter, though surely inflammatory and perhaps

inaccurate, was protected activity under Title VII's opposition clause (and the state-law

counterpart).  *See* 42 U.S.C. § 200e-3(a); Ohio Rev. Code § 4112.02(I).  Pursuant to the statutes,

"employers may not retaliate against any employee that 'opposed' an unlawful practice."  *Braun*

*v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 511 (6th Cir. 2016).  Plaintiff need not necessarily

have done so politely, nor was she obligated to be perfectly accurate on the law or the facts.  *See*

*id.*; *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) ("[Title VII]

does not require that the plaintiff's complaint be lodged with absolute formality, clarity, or

precision." (citation omitted)).  *Braun*, 828 F.3d at 511 ("[A] person opposing an apparently

discriminatory practice does not bear the entire risk that it is in fact unlawful; he or she must only

have a good faith belief that the practice is unlawful." (quoting *Booker v. Brown & Williamson*

*Tobacco Co., Inc.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989)).

      Plaintiff's anonymous letter made clear that she opposed what she perceived to be a

pattern of sex discrimination.  *See* ECF No. 52-4 at PageID#: 1765-66.  On six occasions, the

letter discussed the mistreatment or disadvantages of racial minorities and females in the Police

Department.  *Id.*  On one occasion, the letter stated that "white males" reap unfair rewards in the

Department.  *Id.* at PageID#: 1766.  On another occasion, the letter asserted that two "sexual

harassment complaints" were "brushed under the carpet."  *Id.*  Most pointedly, the letter stated,

"African Americans and females continue to be stifled if not blatantly discriminated against.

There are constant acts of retaliation being committed within [the Police Department]." *Id.*

Mailing the anonymous letter to members of the City Council was activity protected by Title VII

and its state-law counterpart.[11]

Defendants do not deny that relevant individuals eventually discovered that Plaintiff had

authored the anonymous letter, nor do they contest that they took adverse employment action

against her when they subsequently ordered her suspended without pay for 15 days. *See* ECF No.

39-2 at PageID#: 707-712. Rather, they contend that Plaintiff's protected activity was not the

cause of her suspension, but rather her alleged violations of the Police Department Oath of

Office, Code of Conduct, and Technology Policy. ECF No. 34 at PageID#: 420-21; *see* ECF No.

39-2 at PageID#: 707-13; ECF No. 52-1 at PageID#: 1644-48.

Plaintiff rejoins that Defendants' posited rationale is pretextual and that the timing of her

punishment is unusually suggestive of unlawful retaliation. ECF No. 44 at PageID#: 914-16.

She argues that the Technology-Policy rationale is pretextual because, as she attests, "[m]ale

officers and superiors use the internet on [Department] computers for non-work related matters

such as fantasy football and general internet searches that are completely not work related." ECF

No. 45 at PageID#: 971. She also argues that, although the City knew she was the author of the

anonymous letter since at least June 2016 and she was approached by the Law Department at that

_____

[11] Even if mailing the anonymous letter itself were not protected activity, Plaintiff
would nevertheless satisfy her obligation to show that she had engaged in protected
activity. In addition to arguing that the anonymous letter was protected activity, she also
argues that her 15-day suspension was levied as a response to having filed prior EEOC
charges and this lawsuit. Both EEOC filings and civil lawsuit filings are undoubtedly
protected by federal and state anti-discrimination law.

time, she was not punished until October 2017, five months after the EEOC had issued a determination in her favor (ECF No. 39-3 at PageID#: 779) and two months after she filed this lawsuit (ECF No. 1).[12]

Temporal proximity between the protected activity and the adverse action is relevant to assessing causation, *Singfield v. Akron Metro. Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004), but it is not alone sufficient to establish causation unless the timing is "unusually suggestive." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (quoting *Cardenas v. Massey*, 269 F.3d 251, 264 (3d Cir. 2001)). Defendants suggest the two-month gap between this lawsuit (August 2017) and Plaintiff's 15-day suspension (October 2017) is not "unusually suggestive" of retaliation because Defendants were unable to issue any discipline against Plaintiff while she was not on active duty, and they issued her discipline within two months of her return to active duty (in August 2017). *See* ECF No. 55 at PageID#: 1948; ECF No. 40 at PageID#: 883; ECF No. 39-2 at PageID#: 707-12. Plaintiff disputes the notion that she could not have been punished during the period of Injured-on-Duty leave. ECF No. 44 at PageID#: 916.

Defendants' version of events makes sense, but it does not eliminate a genuine issue of material fact. Whereas Plaintiff states that her 15-day suspension was a direct response to her protected activity (opposing sex discrimination in EEOC charges, certain portions of her anonymous letter, and this lawsuit), Defendants say it was a response to Plaintiff's rules violations. Resolution of that factual disagreement is best left to a jury.

---

[12] The filing of the prior EEOC charge and the filing of this lawsuit were both protected activities according to Title VII and corresponding state law.

Summary judgment is denied on this count.

### b. First Amendment Retaliation

The First Amendment prohibits retaliation by a public employer against an employee on the basis of certain instances of protected speech by the employee. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968)). To establish a *prima facie* case of First Amendment retaliation, a public employee must show that (1) she engaged in constitutionally protected speech or conduct; (2) the government actor took an adverse action against her that would deter an ordinary person from engaging in that conduct; and (3) the protected speech was a substantial or motivating factor in the adverse action.[13] *Laster*, 746 F.3d at 733.

To determine whether a government employee's speech is entitled to First Amendment protection, the Court must make three inquiries. First, to earn First Amendment protection, the employee must speak on a matter of public concern. *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 462 (6th Cir. 2017) (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)). Second, "the employee must speak as a private citizen and not as an employee pursuant to his official duties." *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Third, the employee must show that

---

[13] The Supreme Court's ruling in *Nassar*, 570 U.S. at 348, explaining that the causation element in Title VII retaliation cases required a showing of "but-for causation" does not apply to First Amendment retaliation claims, which requires a showing that the protected speech was a "substantial or motivating factor" of the adverse action. *Laster*, 746 F.3d at 733. The Court draws this inference because, although the Supreme Court's decision in *Nassar* (2013) pre-dates the Sixth Circuit's decision in *Laster* (2014), the latter persists in articulating the "substantial or motivating factor" causation standard. *Cf. Rivers v. New York City Housing Authority*, 176 F. Supp. 3d 229, 245-46 (E.D.N.Y) (observing the distinction and suggesting "that the Second Circuit is disinclined to extend *Nassar*'s 'but-for' standard to First Amendment retaliation claims.").

his interest in commenting on the matter of public concern outweighs "the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* Whether any given speech is protected by the First Amendment is a question of law. *Id.* at 464.

First, despite Defendants' assertions that much of the letter was "patently false and misleading" and "humiliating," ECF No. 39-2 at PageID#: 708-09, containing "spurious allegations," ECF No. 34 at PageID#: 418, the Court finds that Plaintiff's anonymous letter did address matters of public concern. The letter, however false or offensive its contents,[14] alleged corruption and criminality within a taxpayer-funded government agency. *See* ECF No. 52-4 at PageID#: 1765-66. Such topics are undoubtedly "of political, social, or other concern to the community," and as Defendants themselves acknowledge, they are surely the "subject of legitimate news interest . . . ." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted); *see* ECF No. 34 at PageID#: 418 (acknowledging that some of the information included in Plaintiff's letter was "already . . . published" in the local news). "The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Snyder*, 562 U.S. at 453.

Second, Plaintiff composed her anonymous letter as a citizen, not in her capacity as an employee. Drafting a memorandum critical of the Police Department was not remotely within her job responsibilities. In its disciplinary findings, the City noted that, while drafting the letter,

---

[14] "[A] public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment." *See v. City of Elyria*, 502 F.3d 464, 492 (6th Cir. 2007).

Plaintiff "was not devoting her time and attention to the effective and professional performance of her assigned responsibilities." ECF No. 39-2 at PageID#: 710.

The third inquiry reveals the parties' strongest disagreement. The factors to be weighed in the balancing of interests include (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the manner, time, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the plaintiff's ability to perform her duties. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

When a police officer's speech is "reasonably calculated to create division, the speech may be unprotected because of its potential negative effect on the public." *Graham v. City of Mentor*, 118 F. App'x 27, 30 (6th Cir. 2004). Moreover,

> [The Sixth Circuit] ha[s] long recognized "the importance of deference" to law enforcement officials when speech threatens to undermine the functions of organizations charged with maintaining public safety. *See, e.g., Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989); *Cherry v. Pickell*, 188 F. App'x 465, 469-70 (6th Cir. 2006) ("[I]n the context of police departments, we have emphasized that the court should show 'deference to the city's judgment on the matter of discouraging public dissension within its safety forces.' ").

*Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017).

Defendants argue that Plaintiff's anonymous letter was not protected by the First Amendment because its controversial content "threaten[ed] to undermine the functions of [the] organization[] charged with maintaining public safety . . . ." ECF No. 34 at PageID#: 419. Chief

Lees attested that he was concerned that Plaintiff's letter would cause "divisiveness" in the Police Department, ECF No. 35 at PageID#: 428, and that it would pose "a distraction and . . . a morale issue" for officers, ECF No. 48-1 at PageID#: 1216.

The parties vigorously dispute whether Plaintiff's anonymous letter actually caused disruption in the Police Department. *See* ECF No. 34 at PageID#: 419; ECF No. 44 at PageID#: 931; *see* ECF No. 48-1 at PageID#: 1216-18 (excerpt of Chief Lees' deposition). The dispute over actual disruption in the Police Department is informative but not dispositive. "A public employer need not show actual disruption of the public agency" to prevail on its argument that an employee's speech was not protected under the First Amendment. *Gillis*, 845 F.3d at 687. It is enough if the government employer "could reasonably predict that the employee speech would cause disruption." *Id.*

In this case, Plaintiff drafted a lengthy list of explosive allegations, including allegations that certain officers were "criminals." ECF No. 52-4 at PageID#: 1766. It was reasonable to predict that Plaintiff's anonymous letter would cause disruption within the Police Department if any officers learned of its existence. That Chief Lees testified to specific instances of actual disruption, ECF No. 48-1 at PageID#: 1218, only fortifies that conclusion.

Plaintiff's anonymous letter was characterized by divisive and accusatory rhetoric, and it was reasonable for City officials to perceive a risk that the letter, if released, would negatively affect Police Department operations. Plaintiff's letter, therefore, was not protected speech, and her claim of First Amendment retaliation fails as a matter of law. Summary judgment is granted for Defendants on this count.

### 7. 2011-Present: Intentional Infliction of Emotional Distress

In her Amended Complaint, Plaintiff alleged that Defendants' treatment, over time, amounts to intentional infliction of emotional distress under Ohio common law. ECF No. 29 at PageID#: 366-67. Because she failed to address the issue in her response to Defendants' motion for summary judgment, the claim is deemed abandoned. *See Brown*, F. App'x at 372.

Summary judgment is granted in Defendants' favor on Plaintiff's claim of intentional infliction of emotional distress.

## V. Conclusion

For the foregoing reasons, all John Doe defendants are dismissed as parties pursuant to Fed. R. Civ. P. 21. In addition, Defendants' motion for summary judgment (ECF No. 34) is granted in part and denied in part.

Specifically, summary judgment is granted in favor of Defendants on the following claims: (1) federal-law hostile work environment between 2011 and 2014, (2) state-law invasion of privacy for the March 2014 disclosure of medical information, (3) federal- and state-law sex discrimination based on the July 2014 transfer to the Family Service Investigation Unit, (4) federal- and state-law discrimination based on the February 2015 promotion and demotion, (5) federal- and state-law retaliation based on the February 2015 promotion and demotion, (6) federal- and state-law retaliation based on the March 2015 discipline, (7) First Amendment retaliation based on the October 2017 discipline, and (8) state-law intentional infliction of emotional distress.

(4:17CV1698)

The following claims shall persist: (1) state-law hostile work environment between August 15, 2011, and mid-2014, (2) federal- and state-law retaliation based on the July 2014 transfer to the Family Service Investigation Unit, and (3) federal- and state-law Title VII and Chapter 4112 retaliation based on the October 2017 discipline.

IT IS SO ORDERED.

  February 28, 2019
Date

    /s/ Benita Y. Pearson
Benita Y. Pearson
United States District Judge